Granny N Pops, LLC, : 
               Appellant : 
  : 
  : 
       v. : 
  : 
  : 
East Lampeter Township Zoning : 
Hearing Board and East Lampeter :     No. 278 C.D. 2019 
Township :     Argued: December 10, 2019

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                    FILED: January 10, 2020

Granny N Pops, LLC (Applicant) appeals from the Lancaster County Common Pleas Court's (trial court) February 14, 2019 order denying Applicant's appeal from the East Lampeter Township (Township) Zoning Hearing Board's (Board) June 22, 2017 decision upholding the Township zoning officer's determination that Applicant's boarding home violated the Township Zoning Ordinance of 2016 (Zoning Ordinance) and denying Applicant a variance by estoppel. The issue before this Court is whether the Board[1] abused its discretion and committed an error of law by denying Applicant a variance by estoppel. After review, we affirm.

---

[1] Applicant specifies the "trial court['s]" errors with respect to the denial of the variance by estoppel. Applicant Br. at 3. However, "[w]here[, as here,] the trial court took no additional evidence, we are limited to determining whether the **zoning hearing board** abused its discretion or committed an error of law." *Hafner v. Zoning Hearing Bd. of Allen Twp.*, 974 A.2d 1204, 1209 n.1 (Pa. Cmwlth. 2009) (emphasis added). Accordingly, herein, this Court shall address whether the Board erred in denying the variance.

Applicant is a limited liability company whose members are Darren Phillips (Mr. Phillips) and Vicki Lynn Phillips (Mrs. Phillips), husband and wife. On June 19, 2015, Applicant acquired the property located at 2939 Lincoln Highway East in East Lampeter Township, Lancaster County (Property), from Clifton Stuckey (Stuckey). The Property includes a main building, garage and barn, and is used as a 14-unit boarding house.[2] At the time of Applicant's purchase, the Property was marketed as a multi-family property with 13 units.[3] The Property is a flag lot containing approximately 1.3 acres, located in the Village Commercial (VC) District, as identified in the Township's official zoning map. Applicant did not contact Township officials to determine the Property's zoning status or the legality of its use before purchasing it.

On May 27, 2016, a Township zoning officer issued and served an enforcement notice (Enforcement Notice) charging that the Property's use as a boarding house was not permissible in a VC District and, thus, violated the Zoning Ordinance. On June 24, 2016, Applicant filed an application (Application) with the Board appealing from the Enforcement Notice and seeking a variance by estoppel to permit Applicant to operate a boarding house at the Property.

On February 23, April 13 and May 11, 2017, the Board conducted public hearings on the Application.[4] Deborah Higgins (Higgins) appeared on Applicant's behalf and explained that the Property had been used as a boarding house in the 1990s and that she had been a tenant at the Property starting in 1999. However, in

---

[2] Although Applicant used the term "rooming house," the Zoning Ordinance does not define that term, but rather defines "boarding house."

There are 11 units in the main building, 2 units in the garage, and 1 unit in the barn.

[3] After acquiring the Property, Applicant added an additional unit to the garage.

[4] At the February 23, 2017 hearing, Applicant and the Township stipulated that a boarding house is not a permitted use in a VC District under the Zoning Ordinance, nor was it a permitted use under the prior 1990 Township Zoning ordinance, and that the Enforcement Notice was valid.

2001, she bought the neighboring property at 2937 Lincoln Highway East from Ross Rhoades (Rhoades), and moved there in 2004.

Rhoades, who owns an auto body repair shop located at 2935 Lincoln Highway East, stated that he moved to 2937 Lincoln Highway East when he was 14 years old, and that he lived and worked on properties surrounding the Property for over 40 years. He further reported that the Property had been used as a boarding house since the 1980s, when Lynne Cole (Cole) owned it.

Stuckey testified that he became a tenant at the Property in 1997 after answering a "room for rent" newspaper advertisement. He represented that he began to hold an equitable ownership interest in the Property in approximately 1999 or 2000 pursuant to an installment sale agreement with Cole. Stuckey explained that Cole operated the Property as a boarding house since the 1980s, and Stuckey purchased it because

> [i]t was a [boarding] house before [he] got it. That's what [his] interest was. [He] would have never bought it just for a house because [he] didn't want a house. And the previous owners had tenants. And so that sparked [his] interest. Because, as [he] got older, retirement, [sic] it would have been a good thing for retirement, yeah.

Board Certified Record (C.R.) Item No. 19, Notes of Testimony, April 13, 2017 (N.T.) at 24. Stuckey acknowledged that he did not know when he purchased the Property that the Zoning Ordinance prohibited its use as a boarding house. Stuckey also described that, in 1999 or 2000, he and Cole built an addition to the main building, thereby adding three rooms.[5] With respect to Township approval for the addition, Stuckey testified:

> Q[.] All right. So during that time, did you add units to the [P]roperty?

---

[5] Stuckey denied any knowledge that Cole filed a separate application in 1999 seeking Township approval for a four-unit motel on the Property.

3

A[.] Yes.

Q[.] And did you get approval to do that?

A[.] Well, it was – it was in 2000, 1999. I didn't do anything after that.

Q[.] All Right. So you expanded without ever coming to the [T]ownship and asking?

A[.] They told me I didn't have to. And if I did, it was – [Cole] was still there. [Cole and his wife (the Coles)] were still there. It was their property. That would have been – I couldn't do anything without their approval.

Q[.] So you got the Coles' approval to expand but you never came to the [T]ownship and got approval?

A[.] No. I wouldn't have to. Because it was [the Coles'] property. All I did was help [Cole].

Q[.] **Okay. To the best of your knowledge, [the Coles] never got approval from the Township?**

A[.] **I don't know.**

N.T. at 38-39 (emphasis added). Thereafter, when Stuckey was asked if the Township was aware of the expansion, Stuckey declared: "I would say, yes." N.T. at 42. Stuckey contradicted his earlier testimony, and testified that Cole applied to the Township for permits for the project, and he "believe[d]" the Township issued a building permit.[6] *Id*.

---

[6] When Stuckey was again asked whether he applied for a permit, he responded:

[A.] I believe [Cole] did for the first initial [main building improvements in 2000]. And[, in the mid 2000s,] I had applied for, whenever I wanted to expand the garage area into [10] units, [8] or 10 units, and got that plot plan or that blueprint that the engineer drew up.

[Q.] Were you given a permit?

[A.] No.

[Q.] Okay. But an application for a permit was submitted?

4

Stuckey further stated that Cole introduced him to (now) former Township zoning officer Lee Young (Young),[7] and that Cole informed Stuckey that Young would provide guidance relative to any work at the Property. Stuckey recounted that, sometime in the early to mid 2000s, he met with Young at the Property on a couple of occasions because he wanted to add more rooms to the Property by modifying the garage, and expand the boarding house use with another building on the south side. According to Stuckey, pursuant to Young's recommendation, Stuckey commissioned an engineering plan and submitted it to the Township, which held a hearing. Stuckey further testified that although the Board liked Stuckey's idea, it required certain conditions be met, including moving a pond, adding blacktop to the driveway area, and installing a sidewalk from the house to Route 30. Stuckey explained that he did not pursue the expansion because he did not want to add the sidewalk and make the other improvements.[8]

Stuckey also described that other Township officials, including fire company members, were aware of the Property's boarding house use. Stuckey

---

[A.] Probably an application, yeah.

[Q.] But you're saying not necessarily, it wasn't necessarily you, it wasn't you that actually asked for the application? It wasn't you? Was your name on the application for the permit?

[A.] Well, yeah. If I applied for it, yes. And that would have been in the mid 2000[]s.

N.T. at 47.

[7] Significantly, neither party called Young as a witness. However, at the close of the April 13, 2017 hearing, the Township's counsel requested a continuance to "consult with [Young and one other witness] and to potentially have them testify." N.T. at 110. Counsel explained: "I'm not sure that both of them will testify. But we will need to talk to them to find out what they do know about the situation." Id. The continuance was granted, but the Township did not call Young as a witness at the following hearing. Further, as noted by the Board, at no time did Applicant request the Board to issue a subpoena to Young to secure his testimony.

[8] The record reflects that there was some confusion at the hearings between the 2000 main house expansion project Stuckey engaged in with Cole, and Stuckey's proposed expansion of the garage in the mid 2000s. See N.T. at 43-47.

claimed he did not hide the use, and even advertised for tenants in the newspaper. Stuckey stated, despite openly operating the boarding house for 16 years, he never received a complaint from the Township or anyone else. Stuckey admitted he did not contact the Township to confirm that a boarding house was a permissible use prior to advertising the Property as a multi-family dwelling.

Mr. Phillips testified that he has operated WD Dump Truck Service (WD) for over five years at 2931 Lincoln Highway East (WD property), which is contiguous to the Property. Mr. Phillips stated, when he first established WD, Young told him about certain Township requirements for the WD property. According to Mr. Phillips, during one of more than one-half dozen visits to the WD property,

> [Young] kind of told [him] who was on both sides of [him]. [He] had [] Rhoades [] to the east of [him], of the [WD] property [sic]. His brother, Virgil Rhoades, was to the west of the [WD] property. **And he said that on the other side of [] Rhoades was a [boarding] house. And he said that was [] Stuckey's place.** That's all [he] ever knew him as. And he said, you know, no one here -- no one will bother you. You should be fine with what you're doing as long as you're, you know, in accordance with the zoning rules.

N.T. at 59-60 (emphasis added). Mr. Phillips recounted that, based on Young's representations, he believed that the Township was aware of the Property's boarding house use. Further, Mr. Phillips also reported that he relied on the realtor listing advertising the Property as a boarding house.

Mrs. Phillips testified that she was inexperienced in purchasing real estate, and the Property was only the second real estate purchase she had ever made.[9] According to Mrs. Phillips, Applicant purchased the Property for $450,000.00. She described that the Property included a main house, garage structure and pool house and explained that there are seven units and a kitchen on the main house's first floor

---

[9] Mrs. Phillips noted that she had worked as a full-time phlebotomist for the last 36 years.

6

and an additional four units and a kitchenette on the lower floor. She also noted there were two units in the garage structure and one unit in the pool house. Mrs. Phillips stated that Applicant had not changed the configuration of any buildings on the Property, but made improvements to the Property costing between $130,000.00 and $150,000.00.[10]

Mrs. Phillips explained that she had been aware of Stuckey's boarding house for approximately ten years before purchasing the Property, because she owned WD on the contiguous WD property for five years and, before that, her children attended school with Stuckey's children. Mrs. Phillips admitted she did not research the Property's zoning status before purchasing it. She declared that she did not discuss the Property's zoning with Stuckey, because the Property had been an operating boarding house for years, and she considered the Property purchase as purchasing an ongoing business. She recounted that she also relied on the real estate broker's representations that the Property was a boarding house. She further recalled:

> I had to prove to the bank that [the Property] wasn't a motel[,] [b]ecause the bank . . . would not loan me $450,000[.00, since] they don't finance motels. I had to prove to them I had long term tenants there in order for them to give me the loan . . . for the [boarding] house.[11]

---

[10] Applicant's improvements to the main house included painting, replacing the sewer pump, central air-conditioning, a holding tank, light fixtures, outside lighting and some shower stalls, and installing new washers/dryers and carpet. The garage structure improvements included painting, adding new doors, windows and rain gutters, and replacing siding, flooring and bathroom fixtures. The pool house structure improvements included replacing windows, siding, carpet and linoleum, refurbishing the porch, and adding gutters. Applicant also filled in an existing swimming pool.

[11] Notably, the bank's appraisal report provides:

> The subject's current use as a rooming house is a special exception use under the C-2 [Z]oning [O]rdinance. Additionally, the [T]ownship [Zoning O]rdinance states that 'not more than four rooms, excluding bathrooms, may be used for the boarding of registered tenants or overnight guests.' However the subject has been utilized continuously at its current capacity for the last 15 years. The subject

N.T. at 84-85. Mrs. Phillips further claimed she would not have purchased the Property if she had known that its use was prohibited, and she would have been unable to do so because the bank would not have lent her the money.

With respect to the hardship that would be incurred if the use was prohibited, Mrs. Phillips stated:

> I was looking at this for a retirement. If this gets closed, I have none. . . . I would still have to pay back the bank for all the money that I borrowed and no means to do it. Because [if] my boarding house is closed, I have no income.

N.T. at 87. She expounded: "I can't turn [the Property] into anything else. I have no road frontage. I have a driveway hitting Route 30. Nobody knows I'm back there. So I couldn't turn it into anything [] other than a [boarding] house." N.T. at 88. However, later, Mrs. Phillips asserted that prohibiting the Property's use as a boarding house would not be a hardship for her, but for the residents. Specifically, she related: "So is it going to impact it? Yes, it will. **Not so much my finances**. **I have my husband and his business**. It's these people that live there that I worry about. It's just not fair." N.T. at 90 (emphasis added).

On June 22, 2017, the Board upheld the Township zoning officer's determination that Applicant's boarding house violated the Zoning Ordinance, denied Applicant a variance by estoppel and dismissed Applicant's appeal.

The Board found as a fact, *inter alia*, that Mr. and Mrs. Phillips did not contact Township officials before purchasing the Property to determine its status or the permissibility of its use. The Board further found:

> 20. [] Higgins and [] Stuckey, witnesses for [] Applicant, testified that they allegedly knew that the Property had been used as a boarding house in the mid-to-late 1990s because

---

> **appears to be** a non-conforming use that is **most likely** grandfathered.

C.R. Item No. 8, Exhibit A-4, at 47 (emphasis added).

they both had resided on the Property, and [] Stuckey subsequently acquired an equitable interest in the Property.

21. In 1999, the Property was involved in a zoning application filed by [] Cole, the then-owner of the Property, docketed as Case No. 99-37, in which [] Cole applied for a variance to reduce the required front yard setback to allow a four-unit motel on the Property.

. . . .

23. In Finding of Fact No. 11 **in the decision in Case No. 99-37, the Board described the Property as being improved with a single[-]family dwelling, garage and barn, not a boarding home**.

. . . .

27. Although both Mr. and Mrs. Phillips claimed to have relied on others, including real estate professionals and the appraiser, to determine the status of the Property, neither person personally checked with the Township or made an inquiry as to the zoning for the Property and the legality of any use on the Property.

Bd. Dec. at 4-6 (emphasis added). The Board concluded, *inter alia*:

Notwithstanding contrary testimony from [] Stuckey and [] Higgins that the Property was used as a boarding house in the mid-to-late 1990s, [] **Cole, the then-owner of the Property, represented to the Board in 1999 that the Property was a single-family dwelling**, as confirmed by the written decision in Case No. 99-37, of which this Board took administrative notice in this proceeding.

Bd. Dec. at 7, Conclusion of Law (COL) No. 8 (emphasis added). Further:

A property owner cannot acquire a right to a variance by estoppel through the actions or representations of prior owners, real estate agents, or other third parties who do not speak for a municipality. **A person who purchases property based on the representations of the seller**, rather than making an independent investigation of the true status of the property, **proceeds at his or her own risk**, and cannot later complain that a variance should be granted if those representations prove to be false.

9

Bd. Dec. at 9, COL No. 15 (emphasis added). Relying on *Skarvelis v. Zoning Hearing Board of the Borough of Dormont*, 679 A.2d 278 (Pa. Cmwlth. 1996), the Board explained that Applicant's failure to ascertain the Property's zoning status was fatal to its entitlement to a variance by estoppel, noting that "whether a landowner's reliance upon municipal inaction is reasonable, a landowner is duty bound to check the property's zoning status before purchase." Bd. Dec. at 9, COL No. 16. The Board also concluded that Applicant had not established unnecessary hardship.[12] Applicant appealed from the Board's decision to the trial court which, on February 14, 2019, denied Applicant's appeal. Applicant appealed to this Court.

Applicant challenges the Board's denial of a variance by estoppel, arguing that it met the requirements for such a variance.

Initially, "[a] variance by estoppel is an unusual remedy and is granted only in the most extraordinary of circumstances." *Springfield Twp. v. Kim*, 792 A.2d 717, 721 (Pa. Cmwlth. 2002). This Court has explained:

> There are four factors relevant to whether a [zoning hearing board] should grant a variance by estoppel.
>
> > Such variances are appropriate when a use does not conform to the zoning ordinance **and** the property owner establishes **all** of the following: (1) a long period of municipal failure to enforce the law, when the municipality knew or should have known of the violation, in conjunction with **some form of active acquiescence in the illegal use**; (2) **the landowner acted in good faith and relied innocently upon the validity of the use throughout the proceeding**; (3) the landowner has made substantial expenditures in reliance upon his belief that his use was permitted; and (4) denial of the variance would impose an unnecessary hardship on the applicant.

---

[12] Board Chairman David Petrisek dissented.

10

> *Borough of Dormont v. Zoning Hearing Bd. of Borough of Dormont*, 850 A.2d 826, 828 (Pa. Cmwlth. 2004) (citations omitted).

*Hafner v. Zoning Hearing Bd. of Allen Twp.*, 974 A.2d 1204, 1212 (Pa. Cmwlth. 2009) (emphasis added). "For [a]pplicants to prevail under a variance by estoppel theory, they must prove the essential factors by clear, precise and unequivocal evidence." *Pietropaolo v. Zoning Hearing Bd. of Lower Merion Twp.*, 979 A.2d 969, 980 (Pa. Cmwlth. 2009).

In the instant matter, the Board denied the variance by estoppel, concluding that Applicant failed to satisfy two of the required factors.[13] The Board determined that Applicant's reliance was not reasonable, and that Applicant had failed to prove unnecessary hardship.

With respect to Applicant's reliance, Applicant argues that record testimony supports that the Property had been used as a boarding house for approximately 30 years, and that Applicant had long been aware of that use and believed the use was permissible. Applicant also contends that record evidence demonstrates that Young and other Township officials were aware of the boarding

---

[13] Although the Board did not directly address the first factor, i.e., "a long period of municipal failure to enforce the law, when the municipality knew or should have known of the violation, in conjunction with some form of active acquiescence in the illegal use," *Hafner*, 974 A.2d at 1212 (quoting *Borough of Dormont*, 850 A.2d at 828), the Board appeared to question the credibility of witness testimony that the Property had long been used as a boarding house, where such testimony contradicted the finding in Case No. 99-37 that the Property was a single-family dwelling.

> A zoning hearing board, 'as fact finder, is the ultimate judge of credibility and resolves all conflicts of evidence.' *In re Appeal of Brickstone Realty Corp*[.], 789 A.2d 333, 339 (Pa. Cmwlth. 2001). Indeed, a zoning hearing board 'has the power to reject even uncontradicted testimony if [it] finds the testimony lacking in credibility.' *Constantino v. Zoning Hearing B*[d.] *of the Borough of Forest Hills*, . . . 618 A.2d 1193, 1196 ([Pa. Cmwlth] 1992).

*Frederick v. Allegheny Twp. Zoning Hearing Bd.*, 196 A.3d 677, 688 (Pa. Cmwlth. 2018).

11

house use but failed to stop it, that the Township approved Cole's application to add several units in the main house in 2000, and that, in the mid 2000s, the Board considered Stuckey's plan to add units to the garage. Finally, Applicant asserts that the real estate listing described the Property as a multi-family property with 13 units.

However, "[m]unicipal inaction in enforcing an ordinance, without more, cannot support the granting of a variance." *Klanke v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 477 A.2d 907, 909 (Pa. Cmwlth. 1984). Therefore, Applicant's reliance on Mr. Phillips' conversation with Young, wherein Young allegedly acknowledged Stuckey's use of the Property as a boarding house, does not establish active acquiescence since even municipal inaction "coupled with some knowledge of the violation by municipal officials" does not demonstrate such. *In re Appeal of Crawford*, 531 A.2d 865, 869 (Pa. Cmwlth. 1987). "While the evidence adduced by Appellants shows that municipal officials knew of the violation, it does not show that the [t]ownship '*actively*' acquiesced in [a]ppellants' use."[14] *Id*. Rather,

---

[14] In *Green v. Zoning Board of Adjustment of the City of Pittsburgh*, 490 A.2d 488, 491 (Pa. Cmwlth. 1985), this Court held: "Although one member of the zoning hearing board stated on the record that he knew [of the subject building's use which violated the zoning code] that is not sufficient evidence to establish a 'clear awareness and strong, long-term acquiescence on the part of the municipality.'" (quoting *Draving v. Lower Southampton Twp. Zoning Hearing Bd.*, 397 A.2d 54, 56 (Pa. Cmwlth. 1979)).

In *Center Township v. Zoning Hearing Board of Center Township*, 522 A.2d 673 (Pa. Cmwlth. 1987), the seller, a township supervisor, assured the purchaser that use of the property for a machine shop was permissible. After the township's zoning officer notified the purchaser that his use was prohibited, the purchaser appealed to the township zoning hearing board which overruled the zoning officer. On appeal, the county common pleas court reversed the township zoning hearing board's decision, holding that the purchaser did not demonstrate a right to a variance by estoppel. Affirming the lower court's decision, this Court reasoned:

> Even if [the supervisor] knew of the illegal use, we cannot impute his knowledge to the [t]ownship. [The supervisor] was only one of three [t]ownship [s]upervisors and he had an apparent self-interest in telling [the purchaser] that he could use the land in any way he wanted. It was incumbent upon [the purchaser] to find out what the zoning law was; the zoning ordinance and map were certainly available to him.

**active acquiescence requires an affirmative act by the municipality, such as** "**granting a building permit or reasonably leading a landowner to conclude his use was lawful**."[15]  *Pietropaolo*, 979 A.2d at 981 (emphasis added).

Although evidence of the Township approvals Stuckey described might reveal the Township's active acquiescence, the only evidence referencing any such applications or approvals thereof is found in Stuckey's somewhat vague testimony.[16] Moreover, there is no record evidence that Mr. or Mrs. Phillips, as landowners, were even aware of the alleged aforementioned applications or approvals, let alone relied upon them.  In fact, the only detailed documentary evidence reflecting past Board action with respect to the Property is the Board's approval of a request to build a

---

*Ctr. Twp.*, 522 A.2d at 676.

[15] In *Pietropaolo*, this Court affirmed the township zoning hearing board's denial of a property owner's appeal from an enforcement notice requiring the owners to cease use of their residentially zoned property for a landscaping business.  The owners argued, *inter alia*, that the zoning hearing board had erred in denying their variance by estoppel request.  In finding that the owner failed to demonstrate that the township actively acquiesced in the use, the *Pietropaolo* Court explained:

> [I]n cases where this Court granted a variance by estoppel, the municipalities did not passively stand by.  Rather, they committed an affirmative act, for example, granting a building permit or reasonably leading a landowner to conclude his use was lawful.  *See, e.g., Knake v. Zoning Hearing Bd. of Dormont*, . . . 459 A.2d 1331 ([Pa. Cmwlth.] 1983) (variance by estoppel granted where borough failed to act for 44 years, knew the use was impermissible for 27 years, *and issued a building permit for the impermissible use*); *Three Rivers Youth v. Zoning Bd. of Adjustment of* [*the*] *City of Pittsburgh*, . . . 437 A.2d 1064 ([Pa. Cmwlth.] 1981) (inaction by municipality for seven years *plus issuance of building permit by municipality* and reliance by landowner on zoning officer's interpretation of regulation); *Twp. of Haverford v. Spica*, . . . 328 A.2d 878 ([Pa. Cmwlth.] 1974) (inaction by municipality for 36 years *and issuance of building permit where municipality knew of intended construction*).

*Pietropaolo*, 979 A.2d at 981 (emphasis in original).

[16] Applicant did not offer documentary evidence of such applications or approvals.

13

four-room motel **that described the Property's use at the time as a single-family dwelling with a garage and a barn**.

Importantly, there is no testimony or other record evidence that Mr. or Mrs. Phillips ever asked Young or inquired of anyone at the Township whether the boarding house use was permissible. In fact, Mrs. Phillips admitted that she did not ascertain the Property's zoning status under the Zoning Ordinance prior to purchasing the Property.

This Court has declared: "**a landowner is duty-bound to check the zoning status of a property prior to purchase. Where a landowner fails to review the relevant zoning ordinance** before purchasing a property, **he may not advance the resulting ignorance in support of a variance by estoppel**." *Hafner*, 974 A.2d at 1212 (emphasis added).[17] Thus,

> '[o]ne who undertakes to make use of real estate for commercial purposes without inquiring as to whether the use is permitted by the municipality's zoning ordinance, does so at his own peril.' *Mucy v. Fallowfield T[wp.] Zoning Hearing B[d.] of Washington C[ty.]*, . . . 609 A.2d

---

[17] *See also Skarvelis*, wherein this Court stated:

> In order to establish that he acted in good faith, a property owner **is required to show that he made a reasonable attempt to ascertain the actual status of the property under the [z]oning [o]rdinance**. *See Moses* [*v. Zoning Hearing Bd. of the Borough of Dormont*, 487 A.2d 481 (Pa. Cmwlth. 1985)] (although owner determined that multi-family dwelling was a permitted use generally in the district and the subject property had previously been used for such use, owner found not to have acted in good faith since an inquiry with the zoning authority would have disclosed that an occupancy permit for that use had never been issued for the property); *Schaefer v. Zoning B[d.] of Adjustment of the City of Pittsburgh*, . . . 435 A.2d 289 ([Pa. Cmwlth.] 1981) (lack of knowledge is irrelevant where owner failed to make inquiry with zoning authority as to true status of property or ask for documentation demonstrating compliance from seller).

*Skarvelis*, 679 A.2d at 283 (emphasis added).

591, 594 ([Pa. Cmwlth.] 1992) (citation omitted). The purchaser's duty to inquire is not limited to whether a particular *use* is permitted but, by implication, must also encompass an inquiry into the limitations placed on the manner in which the property may be used, *e.g.*, a recreational vehicle park was a permitted use but not for permanent residences.

*Kim*, 792 A.2d at 722; *see also Crawford*, 531 A.2d at 868 ("[I]n assessing whether a landowner's reliance upon municipal inaction is reasonable, a landowner is, absent some municipal validation of the use, 'duty[-]bound to check the zoning status of the property before purchase.'") (quoting *Hasage v. Phila. Zoning Bd. of Adjustment*, 202 A.2d 61, 64 (Pa. 1964)). Here, Applicant did not do so.[18]

Finally, Applicant's reliance on the real estate listing describing the property as a boarding house does not support the grant of a variance by estoppel.

> Absent a local ordinance provision to the contrary, **the law requires a prospective purchaser of real estate to make certain the property is in compliance with local zoning requirements**, . . . **and the purchaser may not rely on the statements of others, including dishonest real estate agents, to establish compliance**. If this were not the law, the doors would certainly open wide for unscrupulous individuals to perpetrate a fraud on local municipalities.

*Skarvelis*, 679 A.2d at 282-83 (emphasis added). Thus, Applicant's reliance on the real estate listing, conversations with the realtor, or conversations with Stuckey are misplaced. *See Ctr. Twp. v. Zoning Hearing Bd. of Ctr. Twp.*, 522 A.2d 673 (Pa. Cmwlth. 1987). Based on these considerations, the Board properly concluded that Applicant failed to establish it "acted in good faith and relied innocently upon the

---

[18] Even in those instances where applicants have inquired of township officials whether an intended use was permitted, this Court has held that "[t]hese inquiries are not sufficient to establish good faith reliance where [the a]pplicant never reviewed the relevant zoning ordinances." *Hafner*, 974 A.2d at 1212; *see also Moses*, 487 A.2d at 485 ("While Appellants did make a minimum inquiry [into how the property was zoned without investigating whether the proposed use was permitted], we doubt that it was adequate to place them in the category of someone who innocently relied upon the validity of the existing use before buying the property.").

validity of the use throughout the proceeding[.]"[19] *Hafner*, 974 A.2d at 1212 (quoting *Borough of Dormont*, 850 A.2d at 828).

This Court is sensitive to the impact this decision will have on the Property's vulnerable tenants who shall be forced to find other housing. Despite such concerns, the Court is bound to adhere to the well-established case law and precedent.

For all of the above reasons, the trial court's order is affirmed.

_____
ANNE E. COVEY, Judge

---

[19] Because Applicant failed to satisfy one of the **required** factors for a variance by estoppel, this Court need not address whether the Board properly determined that Applicant failed to prove unnecessary hardship.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Granny N Pops, LLC,         :
         Appellant    :
                              :
           v.                  :
                              :

East Lampeter Township Zoning   :
Hearing Board and East Lampeter  :     No. 278 C.D. 2019
Township                      :

## O R D E R

AND NOW, this 10th day of January, 2020, the Lancaster County Common Pleas Court's February 14, 2019 order is affirmed.

_____
ANNE E. COVEY, Judge